Intellectual Ventures, LLC. Okay, our third case this morning is number 14-1506, Intellectual Ventures v. Capital One Financial. Mr. Boal. Good morning, Your Honors. May it please the Court, my name is Nicholas Boal, on behalf of Appellant Intellectual Ventures. So there are several issues in this appeal, including two one-on-one issues, and the Court has before it two very different section one-on-one issues dealing with two different patents. On one hand, there is the 137 patent, which is concerned with narrow issues regarding managing financial accounts and doing so with a specific narrow technological solution. On the other hand is the 382 patent, which is directed specifically to an Internet problem of providing a certain type of website. So we submit that, frankly, the second issue is the easier issue considering this Court's opinion in DDR Holdings where it said that the patent issue there, the 399 patent, was patent eligible because it claimed a solution directed solely to the Internet and computer networks and was rooted in specific technology. That's precisely what we have here with the 382 patent. Are you conceding the 137 patent is not patent eligible? No, certainly not, Your Honor. Our view is that patent eligibility is certainly broader than the line set forth in DDR Holdings, but concededly the 137 patent does not fit squarely within that holding like the 382 patent does because the 382 patent is directed to only an Internet problem. It is a specific technological problem that is at issue in the 382 patent. What is the specific technological problem? Well, maybe we should step back. How would you define the abstract idea? Well, I would say that there is no abstract idea in the 382 patent. Okay, but what's your fallback position? What do you think is the abstract idea? I would say that if we were to accept what Capital One has argued that specifically tailoring content is an abstract idea, then if we look at the claim limitations themselves, this claim, this patent is not claiming all ways of tailoring content. It's not concerned with all ways of tailoring content. Right, but it's tailoring content on the Internet, so that's not good enough either, right? Well, you're right that that's not good enough, but what it is doing is saying there is a problem with webpages, that there is a problem in the conventional sense of how a webpage looks. And it's important to remember too that this patent, this application was filed in 1998. The patent specification talks about this as the infancy of the Internet and talks about the technology of the Internet not being fully utilized. How broad is the claim? As I read the specification, if the content were varied according to the time of day and according to the geographic address of the user, it would be within the claim, right? It depends, Your Honor, because the claim is actually quite narrow. It requires the use of the interactive interface to facilitate the transfer of the specifically tailored content based both on the user profile data and the website navigation data. User profile data would be addressed, right? That would be one example. That could be one example. And navigation history would be time of day that you click on, right? I'm not sure if that would be correct, Your Honor. I believe the website navigation history would be more in the sense of where has the user been navigating? Where has the user been? I thought the specification was pretty clear that morning and evening was within the claim. I think that the specification is clear that that is an example of how you can tailor data, and that is an example of how you could do it But to practice the claim, you still would have to have those elements, the interactive interface, the user profile, and the website navigation. You would agree, would you not, that historically the tailoring content to time of day and address has been common in the past, right? I don't think that that's the issue, Your Honor. You may not think it's the issue, but is not my statement correct? There is certainly has been tailoring content based on different things. With a difference, though, in the conventional commonplace sense of tailoring content and the unconventional innovative way that the 382 claims is that this idea is to tailor content after we know about the user, after we know about the user's data. The conventional sense, if you were to ever be able to tailor content, and it would be certainly much broader. You wouldn't be able to narrow it down to provide this type of details here. For decades, isn't it been true that publications that are delivered by mail or delivered to your door are the content that's tailored according to your address, or the place where you live? The difference there, Your Honor, I would say is that… Is this true? Your Honor, that's correct. That content has been tailored, though that is not what this patent is about. This patent is about how to make a website after we have learned about the user's data. Now we will construct the website based on that data. What does it mean dynamically, then? Dynamic means that the content can change as the user is viewing the data, and this is another difference between the conventional aspect because in the situation that you proposed, Judge Dyke, the publication is being sent to the user. It's been made. It's been published. Then they determine, okay, maybe we'll send it to this person instead. That content can't change as opposed to the website, which… Did you argue this in your brief? I believe we did, Your Honor, when we discussed why the invention is innovative. When I look at the claim and I see the word dynamic, and when we're talking about dynamically changing or perhaps even a data stream that displays custom content, then I begin to maybe get the scent of something that's innovative. So help me with that, okay? What makes this different when I look at the word dynamic? So what you can do with this patent, with this invention, what you could do on the Internet, which you could not do at all before, and why this is an Internet-specific innovation, is that when I'm looking at a website, that content, the patent claims sending content through data streams. So you have this concept of a stream of data, of a continually flowing pipe of data that's being delivered. And that would make it different from a milling, where you have a single piece that goes out. Here you have a continuous stream of data that's altering and changing? Yes. Do I get that right? That is exactly right, Your Honor. And that's why this patent, just like a patent… Why wouldn't it cover a situation where you had two streams of data, one depending on one address and one on another address? What's the difference between that and the previous approach that publications have had to this? Varying content depending on address. Well, there are several differences. One is the content there is being put together, is being made before you know about that individual person, and then it's being matched… And this requires that the content be made spontaneously. I mean, there's nothing in the claim that said you can't have predetermined content according to different addresses and then supply it depending on where the person is who clicks on. If we look at how the court construed the last limitation of Claim 1, for example, it requires that there's a user preselected by a web page manager that automatically downloads a profile, and then based on the information identifiers in that profile, creates the content to send to the web page. So based on that construction, you have this idea of, first we are going to learn about… What is it that the content can't be pre-designed and pre-created? The content can certainly be pre-designed, but the idea is you have not actually made the website. The website is not made until it is delivered to the user's system and at the web browser… I'm having difficulty seeing what the difference is. The content can be predetermined just as it used to be in the media examples, and it's delivered depending on where you are. Why isn't that right within the abstract idea of doing this, which has been well known for a long time? If Your Honor is saying that the idea of tailoring content is an abstract idea, then when we move to Step 2 of the ALICE analysis, this particular claim certainly adds significantly more to that idea than just… Before we go to Step 2, let's go back to Step 1. All right. When you're updating, is that in real time? Yes. In terms of when you mean the dynamic sending of the data, that can be done in real time, yes. So how we decide to say where this patent is directed to, whether it's just tailoring content or whether it is, in our view, specifically tailoring content on a website to create a new website, which we would argue is not abstract, when you go to… Are you agreeing that tailoring content itself is an abstract idea? I'm agreeing that it is an idea for sure. I don't know that there are guideposts in either this Court's precedence or the Supreme Court to say that tailoring content is an abstract idea. It's certainly not, and there's no evidence in the record to suggest that it's a longstanding business practice or economic principle. What about tailoring content in real time? I would say that that is not an abstract idea. That is something fully new and a fundamental change from how content had been delivered before. That's what the patent talks about. That's what the background of this patent discusses at length. You also agreed that the claim would cover predetermined content. It doesn't have to be changed in real time. You can have predetermined content for people with different addresses, and that would come within the claim as long as it related to a website, correct? If it was being – if it was selectively tailored content that was being sent with the interactive interface and based on the user profile data and the website navigation data, then such a website would fall within the claim. So it's covered even though the content is predetermined and isn't changed in real time? If by predetermined you mean that somebody has said, we're going to have these 50 pictures and we'll save those somewhere, and then once we learn about the user, we will pick picture 13 and make the website with that, I'm saying that that could be within the claim. But that's still a fundamentally different idea than the conventional way of sending media or advertisements. It's different because it involves a website. But apart from that, how is it different? Well, this invention only works on a website. This idea only applies to a website because the purpose of it is to create – to use the technology of the internet to create a better website. Just like in DDR holdings, the purpose there was to create a new website that had the look and feel of the host page and the third-party product on it. The idea here is to provide content that creates a webpage specifically designed for that individual user. It's patentable because it's a webpage? It's patentable because it is a solution that is rooted in technology of the internet and directed solely to the internet itself. And it is a fundamentally new idea. What if the claim preempts all ways of presenting customized information to a web user? That's not the situation that we have. But what if it did? If it did do that, then you have to go back to the first question of is that actually an abstract idea of presenting all kinds of – What if the abstract idea is tailoring information to an individual based on the individual's characteristics, individual's own information? That's the abstract idea. Now there's a claim that says do that by presenting webpages on the internet. Okay. Now we have abstract idea on the internet. That's not good enough either. So there has to be something more, something above and beyond the impermissible patenting of an abstract idea on the computer. What's that in this claim? That in this claim is using the interactive interface. What is the interactive interface? The interactive interface is the – Is it like a graphical user interface, GUI? No, no, Your Honor. And the patent discusses this in some detail in columns five and six and gives the example of a web manager. And the idea is – What's a web manager? A web manager is the software that is going to orchestrate the taking into the user profile data and is going – But your experts weren't unable to agree on what interactive interface means. They came up with it could be a number of things. Well, I think Capital One has mischaracterized what our experts said. What our experts said is essentially what I just said, that it will use a number of things because, of course, the web manager, the interactive interface, is existing within a full computer system. So what's a web manager? Software? Hardware? Yes, it's software, Your Honor, that will run on hardware. Is it a module? It can be a module in terms of a program that is designed to do – It's basically the brains of the outfit, right? That's correct, Your Honor. And wouldn't you need some kind of brain of the outfit any time you were going to, on the Internet, tailor information for a user every single time? Well, this, quote-unquote, brains of the operation is specific. It's sitting – it's sort of a back-end brain of the operation. Right, it's a program computer. You will need a way to tailor content for sure if you're going to do this. This is a specific way where you have this web manager that's sitting on the back-end that is taking the information and delivering it. There are other ways that you could do it. I guess that's the concern I have with this claim is that the elements of the claim recite, essentially, the necessary elements you would need for anybody to tailor information to an individual through a web page. I think then it's instructive. You need a brain. You need a program computer there. You need to have access to the individual's personal information, some kind of personal information. And then through that, through that broad-based input into the black box interactive interface, you get your output, some kind of content that would hopefully likely be appealing to the user. That's what the claim looks like to me. That's not quite the claim, Your Honor, because one thing that's different is it's not just saying we need some characteristics about the user. You need very specific – you have to have the user profile data and the website navigation. But the user profile could just be an address. It could be, Your Honor. But we need that in addition to the website navigation data. The browsing history? The browsing history? Yes. So this is different than just saying – Browsing history? Where does it say it has – The website navigation data is what I would – I thought you agreed that clicking on the website at a particular time of day would be within navigation history. I agree that that is a way of tailoring data. Not necessarily that's website navigation history or website navigation data. That could be instead part of the user profile if this user is signing on at a certain time. I'm surprised that you're focusing the innovative concept here on the interactive interface. And so my question to you is that if we find that the interactive interface is not enough to lift this out of an abstract idea arena, then do you lose? No, Your Honor. As you pointed out – What else is there then? What else is there is also the dynamic content of the claim. And that's what makes this an internet-specific invention is that you can provide the dynamic content over this data stream. You can provide it over the internet to a website. And that's exactly why this invention only works – Why isn't that just applying an abstract idea to this new technology? Because you couldn't do this idea in any other sense. Well, that's been true of a lot of the other cases where you can't use prior technology to achieve it on the internet. You have to have the internet technology, and adding the internet technology doesn't in and of itself make an abstract idea patentable. I would say that in other cases where this court has found abstract ideas and patents directed to abstract ideas and eligible, they were all directed towards commonplace things that could be done outside of the internet. In Ultramarshall, for example, you could – there was always the idea of being able to – But Ultramarshall required the use of the internet, right? It did, but it was not directed to how to use the internet. This is directed to how to use the internet. It wasn't directed how to use the internet. It said it's a way of using the internet to say that you get free content if you look at an ad. But that's what it was directed to was looking at an ad and using – if you look at an ad, we'll give you content. That was the idea that it was directed to. Here, the idea – It was directed to doing it on the internet, right? And that's why it failed is because it was just a commonplace idea that had existed before the internet and saying do it on the internet. This is not an idea that existed before the internet because you could not create media in this way. You could not – But you could tailor content before the internet, right? Certainly, but that wouldn't come within the confines of the claims here, and that's not what this – Because it involves the internet. No, because the content is – The publication is different here because you're making the content after you learn about – You're making the website after you learn about the user, and you're able to provide dynamic content. Isn't that how you would always tailor information for an individual based on information you knew about the user first? How in the world would you be able to do any kind of tailoring of content for an individual without knowing something about the individual in the first instance? Before you would create content based on groups of individuals or groups of people, you would say – Like based on their address, you know, the LA Times. If you live in Orange County, you're going to get the Orange County section included with your LA Times newspaper. Likewise, you're going to get an advertising insert in your LA Times newspaper that is for services that are available in Orange County. If you live in the valley, San Fernando Valley, you're going to get the San Fernando Valley insert. So that's based on information you knew already about the particular reader of the newspaper. And I think Your Honor's hypothetical goes to why this is different because in that instance, what is happening is the LA Times or the publication is making the content and then saying, all right, we have groups of people that live here. Let's send them content A. We have groups of people that live here. Let's send them content B. And you're basing that on sort of large swaths of people, not on an individual's specific characteristics. So here in this instance – Well, I thought in the spec this is, you know, if you're a rich person, you get advertised the rich coffee. If you're not so rich, you get the sludge of coffee, right? That's what the spec says. That is what the spec says. So we're talking about broad-based categories of people. We're not necessarily in your claim talking about very specific, targeted, individualized, personalized marketing based on 80 million different factors to come up with the perfect coffee for a person. And the difference here though, Your Honor, is that in our invention, what the internet allowed you to do is say, all right, if I go to a website, they can say, all right, you know, Nick is a poor person. Give him his sludge coffee. They make that determination after I've gone there. No, you said that the content could be created before the person clicked on and streamed to the person depending on that characteristic of residence. There is a significant difference between creating the content and creating the webpage. When you create the content, what you are doing is creating a large volume of possibility of content. The webpage would be what you are describing, Judge Chen, of sending out the flyer with the newspaper. That is not made until we have learned about that specific person. And in this instance too, we can now – it cannot be the same as that flyer because that flyer will never change its content. When you receive that flyer, it will be the same flyer on day one. But you agreed that there could be predetermined content here that didn't change. They create content for the webpage depending on somebody's address and they communicate that content to the person depending on that person's address. What's the difference? I don't understand. The difference between that and the earlier media practice. The difference is that here you have the ability with this invention to change the content. Before, you didn't. But where does it say that you have to have the ability to change the content? The claim requires that the content be dynamic. In particular, if you look at Claim 1, it requires an interactive interface configured to provide dynamic website navigation data to the user. So the content has to be dynamic. What does dynamic mean? That could just be high-end coffee versus low-end coffee. It could be, Your Honor, but it could also be a situation where that now you have something is, as I'm looking at the website, something is being updated or something is changing. Yeah, but that's the point. It could be, but it's within the claim that the content is predetermined and streamed to somebody depending on address. It doesn't require that the content be changed when it's communicated. It requires that the website data be dynamic is what the claim does require. So what you do is you're creating a tile. It's got predetermined content in it. And when somebody gets on the website, then there's a determined what makes it dynamic is that the choice of the content of the data that's in there then is streamed to the user. And that's what caters it. Correct. So it's kind of like the opposite of what you do when you do research to send out a political mailing. That's exactly it. And that's why this is a fundamentally different idea than what was done before. Before you sit down, I think you're already out of time. I'd like for you to just make a couple of comments on interactive interface and whether it's indefinite or not. It is not indefinite, Your Honor, because one of skill in the art would have reasonable certainty as to what it means. The only evidence in the record is the evidence of IV's expert explaining what it means. There is no evidence. But what would be a one-sentence sum-up of the meaning of interactive interface? The interactive interface is the software providing the dynamic content. But it's also the display itself, right? No, Your Honor. Why did you use the word medium before? Well, the patent uses the word medium. Right. So we've got to at least be a little bit tethered to the patent. And we believe that by saying medium that that is the idea of the software providing that data, providing that medium. Right, because the interface comprises a display, right? So the display is part of the interface. It can't just be software. If you mean by display the website, that's what display means here, not display in a sense of a hardware physical display that I have in front of me. The district court specifically found in its construction that when the patent uses display, it doesn't mean a physical display. But it's the software that's providing the content that is sent to my system and then is assembled as a website. Okay, Mr. Ball, I think we're way out of time. We need two minutes for rebuttal. Thank you, Your Honor. Mr. Moore. Good morning. May it please the Court. Picking up with the 382 patent, the two points we heard that changed the unpatentable abstract idea of the 382 patent to patentable subject matter here were the interactive interface and the dynamic website navigation data. With regard to the interactive interface, IV says in response to the indefinite arguments that they said today it could be software. But they said in their brief it could also be any means for communication. They say that on page 46 of their opening brief and on page 29 of their reply brief. So they've also said in other places in their brief it could be software. Today we heard it could be a webpage manager. Isn't that more an issue of whether the term is indefinite as opposed to a one-to-one issue? Look, it goes to both. Because here when you say that the interactive interface can be any means for communication, simply adding a means for communication to a claim is insufficient under Step 2 of ALICE to transform that unpatentable abstract idea into patentable subject matter. So you can't say on one hand the interactive interface is only a means for communication and on the other hand it transforms the claim into patentable subject matter. Because simply being a generic means for communication, the claims in ALICE had a communications controller, and the Supreme Court found that wasn't sufficient to transform the claim from unpatentable subject matter to patentable subject matter. But maybe this isn't generic structure. Maybe this is doing something that no computer had ever done before. So now there's some kind of interesting novel functionality happening here. Well, for that to be the case, it would have to be in the claim or in the court's claim construction. In the court's claim construction here, just tell it to be a medium. But I'm talking about the claim overall. The claim overall is tailoring information using these factors to present information to website users, assuming that's a new functionality to be able to achieve that kind of personalized use or provision of information and content. And what we have here is something special and unique. Well, first of all, if you look at the patent specification, it describes you're not talking about something special and unique. Tailoring content on the Internet was known before the 382 patent. I think they've either admitted that that's true or they've come pretty close to admitting that that's true. But what I understand them to be saying is that it wasn't known to do that in connection with web pages before. So this is addressing a specific thing having to do with the Internet, which somehow makes it different from the abstract idea of tailoring content in the print context. Well, there's two responses to that. First, it wasn't new in the Internet, and the 382 patent describes that. In any event, if you simply take an abstract idea of tailoring content and move it onto the Internet under Altomercial, that's not enough. In Altomercial, they were also dealing with dynamic website navigation content. In Altomercial, they had controlling access or providing access to content based on whether the user had viewed advertisements or answered specific questions. So they're dynamically having website navigation data, whether you view the advertisement or whether you answer the questions, to determine what content we'd get access to. And that wasn't sufficient in Altomercial to make the claims patentable. Also, if you look at the 382 patent, it's in several places. But the most telling is column six, lines 18 through 22, which is in the joint appendix to page 43. It talks about the most beneficial aspect of the invention as it permits a company to tailor content, to tailor the delivery of information to a specific user without requiring the user to input a lot of mundane and unnecessary information. It's not that you could deliver tailored content. What made 382 special is that you could deliver the content without requiring the user to input a lot of mundane information. And if you go back to column three and column four in the background of the patent, they explain that delivering tailored content on the Internet in response to a user entering their profile, entering their user ID and their password, or answering questions, that was known, the idea that you could pick, okay, this is Matt Moore, I want to put up this block of information because this is what he's interested in, this block of information because this is the way he answered certain questions. Maybe that makes this a special implementation of tailoring information to a web user. Instead of forcing a user to enter in all this information right then and there in the present, it's all based on prior inputted information by the user. Well, here when you look at the claims, and I direct the court to the claims of the 382 patent, which are in the Joint Appendix, page 44, there's nothing in the claims that add any specific implementation detail. If you break these claims down, what you really get to is a display depicting portions of the website visited by the user, just a display, conventional, like any computer, just like Alice, as a function, a function they don't even specify. So how this content is displayed on the display is not even claimed. It couldn't be more generic. It's just a function in the claim. And the only thing they specify are the two data inputs. And specifying certain data inputs are not enough to transform an unpatentable abstract idea into patentable subject matter. What about the provision that deals with the dynamic use of data? Well, it's not the dynamic use of data. It's dynamic website navigation data. So all that is is your user activity on the website. That's your browsing history. And so all you have is a data input that changes as the person uses the internet. Is that an improvement over functionality of the internet? No, because browsing history has been used long before this patent. Not the web browser usage, but tailoring information based on web browser usage. Ultramershal had that as well. Ultramershal had tailoring the information about the user. Did the user view the advertisement? Did the user answer the interactive questions? And based on how that history changed, when the user hadn't viewed the advertisement, the user couldn't access the copyrighted media. When the user had seen the advertisement or had answered the interactive questions, then after that browsing history had been created, they could see the content. So it's no different than the content that was used in Ultramershal. Is it your position that claims like in this category are just out? Or are you saying that with more implementation details, this claim would be eligible under 101? With more implementation details, it would be eligible, like in DDR. It's a fundamental difference between the two cases. I'm not sure that's the difference between this case and DDR. It's implementation details. Well, there's multiple differences. The fundamental difference in the sense that in DDR, solving a problem was created by the Internet rather than a problem that existed before and was addressed. That's correct. I'd say there's at least three distinctions. First, in DDR, that claim was necessarily rooted in technology, where here it's not. In DDR, as you were explaining, What about the provision of the data in real time? There's nothing in the claims that requires the provision of data in real time. And even if they did, Alice and Ultramershal dealt with that as well. In Alice, the computer made it real time, and simply using the Internet or a computer to take a longstanding problem, tailoring content, and do it faster in real time wouldn't be sufficient to transform the claim. But real time is different from doing it faster, isn't it? Real time is... When you say real time, you're not even measuring it in terms of pace. It's continuous. Well, first, there's nothing in the claims that requires it to be in real time, or there's nothing in the claims that requires it to be continuous. If there was something in the claims, if we were to find the dynamic term with respect to data, that that was real time, then would you say that this is pan-eligible? That that lifts it out of the abstract arena and supplies the innovative concept that we would require? No, because to the extent you would find that, it would be the same as Ultramershal, where whether the user had viewed the advertisement or whether the user had answered the questions changed. That would have changed in exactly the same way, so it would be indistinguishable from the idea and the way Ultramershal used the Internet. I guess maybe the difference Judge Reyna is suggesting is that what if there was a panel on the website display showing the Dow Jones ticker moving... There's a constant data stream where the data being presented on the display, although I'm not sure what the word display means anymore after talking to opposing counsel, but here in this instance, talking about a display where you see the Dow Jones moving up and down moment to moment, and so therefore, there is some kind of dynamic real-time data. It's not some kind of fixed, cold, stored data that's being presented to the user. I wouldn't see how that would make a difference either. If you're just real-time data as opposed to just pre-stored data, data streams have been along long before the 382 test. But they're not static. A data stream is not static. A data stream that's not second-hand. Well, in this case, they are. The examples they give, and if you look at the patent, the time of day... The claim goes to dynamic data, and we're being told that dynamic would be real-time. Well, the claim goes to dynamic data only in the sense... If you look at the only place dynamic is used in the claim is dynamic website navigation data. So when I'm on the Internet and I'm navigating around, I went to website A, I'm going to website B, I'm going to website C, that data is being updated by what I've done on the Internet. That's the exact same thing that AlterMercial had. Because here, I go on the website first, I can't access the copyrighted media because I haven't done what's required. Now, I navigate the website, okay, I want to view the advertisement, I view the advertisement, they ask me a few questions, I answer the questions. Now, because that data's been changed, I can view the content. So it would be indistinguishable from AlterMercial. Do you read dynamic potentially as the same adjective as customized or tailored, individualized? You know, this is... you're providing data that is individualized or customized to the user? Customized or changing. Changing would probably be the word I'd use. Dynamic just means that that data changes as somebody browses the Internet. So what would this claim need, in your understanding of 101, to get over the hump that it doesn't have now? I think it would need to be necessarily rooted in technology, it'd be having to solve a problem that only existed because of the Internet, and it would have to do something in a very specific way. It would need all three things? Yes. Like, what if there was some kind of algorithm presided in the claim for how the interactive interface actually accomplished its function of providing the customized information? Would that be enough for 101? No. Even if it's not necessarily, you know, solving a problem rooted in technology? No, and that's based on the Supreme Court in Fluke, where there they specified a specific algorithm that was presumed to be novel, and it still wasn't sufficient to transform the claim in a patentable subject matter. I'm looking at page 43 of the record, and this is column 6 of the patent, line 40 or 39. So this system allows the information provider to selectively provide information to the information user without the information user's knowledge. Without irking the information, the user, by telling them that they need a password or they need to be a member. It permits those members to get the information seamlessly. Isn't that innovative or an innovative concept as opposed to what the prior art had and that's the static mailing of a letter to a designated universe? Here, the system is seamlessly providing the information without the user inputting the information. No, because there's a fundamental distinction here in the claims, and this was discussed by my friend. First, the only thing that's dynamic about the data in this case is the website navigation data that's stored is an input to what's just shown on the page. As far as the content, there's nothing in the claims that suggests the content isn't pre-stored. In fact, the only examples the patent gives are the time of day, simply by looking at, of course, the time of day is dynamic website navigation data when I log in, and it just looks at that time of day and then it puts up the pre-stored. If it's morning, I can provide the content. Just putting the content issue aside and the tailoring of content, doesn't this read to a change in the use of the internet to where now you have a seamless stream of information that's being supplied to whether, forget the content, just the technology itself, the method of streaming seamlessly information without the user having to do anything, and that information is much like the ticker tape that's sitting there. You don't have to do anything. It's just showing you the Dow Jones average on a continuous basis. Is that what we have here? No, because that's not required by the claims. The claims cover the example of simply time of day. You've got to go back to the language of the claims. And the claims say you just have this display as a function of user personal characteristics. Yeah, but I think what he's asking about is the user doesn't have to enter any data in order to get the content. And that's the difference here. But I guess that was true before, too, in the print media examples, right? Correct. Correct, it was true in all print media. You could change in real time, whether you're a Republican or a Democrat, and get a different political map. Even in a conversation, whenever they're talking to somebody... But that's static. You're doing something. But here, as you move through the use of the Internet, it's reading you. You're not providing that information. You're not saying, I'm a Democrat now. I'm a Republican now. Well, just in the conversation example, you would. When anybody's talking to somebody else, they tailor what they say based on who they are and what they're interested in. And as you learn something new they're interested in... That's a conversation, but this is a one-sided conversation, isn't it? Well, that's the difference here. Here, the data of personal characteristics and website navigation data is pre-stored. And that navigation data gets updated... Once you pre-store it, then the data stream that comes to you is different. But the content is pre-stored. That's originally... The content is pre-stored. My name, my gender, my race, whatever. That's pre-stored, but after that, on the basis of that information, I'm receiving a stream of data that's different based on my usage of the Internet. That's no different than newspapers, than political mailings, or even in the prior art that they've distinguished. They distinguish that what's being streamed to the user is different based on what they answer as questions. That existed, and they admit that was in the prior art. When I look at a newspaper, it's not updated as I'm reading it. Well, the content, for example, when the user was entering questions, as they talk about in the prior art, and they talk about the most beneficial aspect of this invention, and they even say in the sentence you cited, they don't have to irk the person to enter any... They don't want to irk the person to enter information. Right, it updates it automatically. But when they enter the information, that content, the stream, that part of the claim is fundamentally unchanged. The only difference here is the data input, whether it's the pre-stored personal characteristics or whether the user had to log in. And simply changing data inputs isn't sufficient to change an unpatentable abstract idea to a patentable subject. You can imagine how easy it would be to tailor claims with Draftsman Art to change the data inputs. And that's the only thing they did here  and the website navigation data, instead of having it entered, they required it pre-stored. But the data inputs are still the same. Okay, all right. Thank you, Mr. Martin. Mr. Boll, you've got two minutes here. Thank you, Honor. Briefly, I just want to reiterate that this patent, the 3.2 patent, is very much directed to a problem that only exists on the Internet. This is not the situation in Ultramershal or other cases where there was a problem, that commonplace issue that existed before. If we look at the specification itself, it says this invention pertains to the global computing network otherwise known as the Internet. That's in the field of the invention. And the argument was also made in DDR Holdings, well, isn't this really, when you're creating this hybrid website that is a composite of the host website and the third-party product, isn't that really the store-within-the-store concept? And the court said that that analogy did not account for the ephemeral nature of the Internet or the instantaneous transport of data on Internet protocol. That's what's going on here, is there's an invention that says we have this new technology. How do we use it to create something new and different? And the reasons, again, that this is different than something that came before is you have dynamic content, which I will say I believe is different than just customization. I think dynamic, when it uses that, it gets to this idea of the data stream, so the pipe of data that's being continually delivered. And you have the profiles that are being automatically downloaded, so you have... I still don't quite get it because the data that could be ultimately presented to the user can be static. It doesn't have to, the claim doesn't require, I don't think, that the data be like the running ticker of the Dow Jones. It does require that, by the words of the claim, that the data be dynamic. That could be that the same data is being supplied for a time, or it could be that the data is being changed, but the dynamic data has to be continually being delivered to the... You have to have... You agreed earlier that with fixed content, pre-created, pre-determined content, streaming that would be covered by the client. If it's streaming the data, correct, Your Honor. But that's fundamentally different than what we had before with a print mailing. There's no streaming. It's done electronically through the mail. If that were the test, then every time you used the Internet for an old idea, it would be patentable. We know that's not true. And the point I'm trying to make is that this is not an old idea. This is a brand new idea that solves a problem on the Internet of how to use specific Internet technology to do this. I just want to briefly say, too, that a lot of what Mr. Moore was saying really goes to either 102 or 103 arguments of, well, hasn't this... This has been done before, hasn't it? That is a different test. And then his other argument was, or he said that this patent would be eligible if it had more details, if it specified in greater detail exactly how to perform it. That's an enablement question, though. The question should be, if one of skill and the art can read the claims... Well, preemption matters in 101. If you've preempted all ways of achieving a given result, that can very much be a 101 problem. That is true, Your Honor, and we do not preempt all ways of doing it. In fact, the district court in its construction provided the specific implementation details, and I would argue that Mr. Moore is wrong, that there is not a specific implementation. And again, I point the court to the district court's construction of a display depicting portions of the website visited by the user as a function of the user's personal characteristics, where the court construed that as a display depicting portions of the website of the user preselected by a web page manager by matching personal characteristics in a user profile automatically downloaded from the interactive interface based on information identifiers. It goes on to say, to address your question, I don't want you to be confused what I mean about display. It talks about how display does not refer to a physical device, but rather the depiction of the website. So here, when the patent uses display, it's really talking about what you see on the screen, but not the hardware, the screen itself. Does that help alleviate that confusion? So can I see it or can I not see it? You can see it, but the display refers to the website that's being shown. And I believe I'm out of time. Thank you. Mr. Ball, thank you. Thank both counsel.